# Illinois Official Reports

## Supreme Court

***Blumenthal v. Brewer*, 2016 IL 118781**

| | |
|---|---|
| Caption in Supreme Court: | JANE E. BLUMENTHAL, Appellant, v. EILEEN M. BREWER, Appellee. |
| Docket No. | 118781 |
| Filed<br>Rehearing denied | August 18, 2016<br>October 20, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County; the Hon. Leroy K. Martin, Judge, presiding. |
| Judgment | Appellate court judgment vacated in part and reversed in part.<br>Circuit court judgment affirmed. |
| Counsel on Appeal | Reuben A. Bernick, of Chicago, for appellant.<br><br>Angelika Kuehn, of Oak Park, and Catherine Sakimura, Shannon P. Minter, Amy Whalen, and Jaime Huling Delaye, all *pro hac vice* and all of San Francisco, California, for appellee.<br><br>Camilla B. Taylor and John A. Knight, of Chicago, and Nancy D. Polikoff, of Washington, D.C., for *amici curiae* American Civil Liberties Union of Illinois *et al*. |

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, and Kilbride concurred in the judgment and opinion.

Justice Theis concurred in part and dissented in part, with opinion, joined by Justice Burke.

Justice Theis dissented upon denial of rehearing, with opinion, joined by Justice Burke.

**OPINION**

¶ 1     In this case we are called on to consider the continued viability and applicability of our decision in *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979), which held that Illinois public policy, as set forth in this State's statutory prohibition against common-law marriage, precludes unmarried cohabitants from bringing claims against one another to enforce mutual property rights where the rights asserted are rooted in a marriage-like relationship between the parties.

¶ 2     The issue has arisen here in the context of an action brought by Dr. Jane E. Blumenthal for partition of the family home she shared and jointly owned with Judge Eileen M. Brewer. The couple had maintained a long-term, domestic relationship and raised a family together but had never married. Blumenthal sought partition of the residence when the relationship ended and she moved out.

¶ 3     The partition action itself presented no question under *Hewitt*. The problem arose when Brewer counterclaimed for various common-law remedies, including sole title to the home as well as an interest in Blumenthal's ownership share in a medical group so that the couple's overall assets would be equalized now that the couple had ended their relationship. Blumenthal moved to dismiss, asserting that the various counts of the counterclaim should fail as a matter of law under *Hewitt*, which rejected a woman's suit to divide assets she accumulated with a man during a long-term relationship in which they lived together and had three children together but never married. The circuit court agreed, and the counterclaim was dismissed in full.

¶ 4     The underlying partition action between Blumenthal and Brewer proceeded to final judgment. No appeal was or has been taken from that judgment. While the partition proceeding was following its course, however, Brewer pursued an appeal of the dismissal of her counterclaim pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), arguing that *Hewitt* should be rejected and should not bar any of the relief she sought.

¶ 5     The appellate court agreed with Brewer's position. It rebuffed *Hewitt*'s holding as outmoded and ill-considered, undertook its own public policy analysis, and held that the public policy of prohibiting unmarried domestic partners from bringing common-law claims against one another no longer exists in current law. Accordingly, it vacated the circuit court's dismissal of Brewer's counterclaim and remanded the matter to the circuit court to consider additional arguments raised by the parties. 2014 IL App (1st) 132250, ¶ 40.

¶ 6    This court allowed Blumenthal's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013). We also granted the American Civil Liberties Union of Illinois and Lambda Legal Defense and Education Fund, Inc., leave to file a friend of the court brief in support of Brewer. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). For the reasons that follow, we now vacate in part and reverse in part the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 7                                    BACKGROUND

¶ 8    This litigation began in 2010 when Blumenthal filed her verified complaint for partition pursuant to section 17-101 of the Code of Civil Procedure (735 ILCS 5/17-101 *et seq.* (West 2012)) in the circuit court of Cook County. The portion of the partition action relevant here was directed at the parties' South Kimbark residence (hereinafter sometimes referred to as the Chicago home), which Blumenthal jointly owned with Brewer, who had been her domestic partner since approximately 1981. Blumenthal's complaint requested that "a fair division and partition of [the] property be made between the parties *** according to their respective rights and interests." The complaint further requested, in the alternative, that if the property could not be divided without manifest injustice to the parties in interest, then it should be sold by or under direction of the court, with the proceeds of the sale to be divided among the parties "according to their respective rights or interests in such proceeds as ascertained and declared" by the court.

¶ 9    Brewer's counterclaim, which is the focus of this appeal, was premised on the couple's domestic relationship, which Brewer characterized as "identical in every essential way to that of a married couple." As finally amended, the counterclaim contained five counts. Counts I, II, IV, and V all pertained directly to the disposition of the parties' home in the underlying partition action. Specifically, they sought to guide the court with respect to how the party's respective rights and interests in that property should be ascertained and valued and how the property should be divided. Count I sought imposition of a constructive trust based on unjust enrichment. Count II argued that the house should be divided based on principles of equitable division. Count IV asserted that in allocating the value of the house, the court should factor in amounts expended by Brewer to maintain it after a certain date. Invoking principles of *quantum meruit*, count V claimed that apportionment of the home's value should take into account the value of Brewer's time in making sure the property was adequately secured, maintained, and repaired. Count III sought a constructive trust over the annual net earnings or the sale of Blumenthal's share of her medical practice, or in the alternative, restitution of funds that Blumenthal used from the couple's joint account to purchase the medical practice.

¶ 10   In the circuit court, Blumenthal successfully argued that all counts of Brewer's counterclaim were barred as a matter of law by this court's decision in *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979). As noted earlier, *Hewitt* held that Illinois public policy, as set forth in this state's statutory prohibition against common-law marriage, precludes knowingly unmarried cohabitants from bringing claims against one another to enforce mutual property rights where those rights are rooted in a marriage-like relationship between the parties.

¶ 11   On appeal to the appellate court, Brewer contended that dramatic shifts in public policy had rendered this court's decision in *Hewitt* obsolete and that *Hewitt* no longer represented an accurate view of how Illinois law should treat such a claim today. Brewer contended that at

the time *Hewitt* was decided, it was public policy to treat unmarried relationships as illicit but in the decades since *Hewitt*, the Illinois legislature had repealed the criminal prohibition on nonmarital cohabitation, prohibited differential treatment of marital and nonmarital children, adopted no-fault divorce, established civil unions for both opposite-sex and same-sex partners, and extended other significant protections to nonmarital families. Thus, Brewer maintained that in light of these profound changes, *Hewitt*'s restriction on common-law claims being brought by unmarried partners has been implicitly overruled and that continued application of *Hewitt* would directly contravene the current policy of this state.

¶ 12        Blumenthal responded that *Hewitt* was not based on a legislative policy to stigmatize or penalize cohabitants for their relationship but was instead based on a statute that abolished common-law marriage in this jurisdiction and is now known as section 214 of the Illinois Marriage and Dissolution of Marriage Act (Marriage and Dissolution Act) (750 ILCS 5/214 (West 2010) ("Common law marriages contracted in this State after June 30, 1905 are invalid.")). Blumenthal contended that *Hewitt* remains good law because it gives effect to Illinois's ongoing public policy that individuals acting privately by themselves cannot create a marriage relationship and that the government must be involved in the creation of that bond. In Blumenthal's view, reversing the circuit court's dismissal order would require the appellate court to overrule *Hewitt* and its progeny, something it had no authority to do, and, in effect, resurrect common-law marriage in Illinois.

¶ 13        In a detailed discussion, the appellate court found some merit in both parties' arguments but ultimately agreed with Brewer's claims, finding that the primary basis for the result in *Hewitt* "ceased to exist." 2014 IL App (1st) 132250, ¶¶ 18, 25. To support its claim that *Hewitt* is now obsolete, the appellate court adopted Brewer's list of post-*Hewitt* policy changes and laws that relate to property rights of married or unmarried couples. *Id.* ¶¶ 30, 33-34. In particular, the appellate court gave considerable weight to the fact that in the decades since *Hewitt* was decided, the Illinois legislature has repealed the criminal prohibition on nonmarital cohabitation, prohibited differential treatment of marital and nonmarital children, adopted no-fault divorce, established civil unions for both opposite-sex and same-sex partners, and extended other significant protections to nonmarital families. *Id.* ¶¶ 23-27, 33-34.

¶ 14        The appellate court also disagreed with the policy finding in *Hewitt*, arguing that *Hewitt* "may have the contrary effect [of discouraging cohabitation and encouraging marriage because] refusing to hear claims between unmarried cohabitants creates an incentive for some to not marry." *Id.* ¶ 32. Thus, the appellate court believed that "[a] cohabitant who by happenstance or design takes possession or title to jointly acquired assets is able to retain them without consequence when their 'financially vulnerable' counterpart is turned away by the courts." *Id.*

¶ 15        Finding that *Hewitt*'s common-law ban was misplaced, the appellate court determined that Brewer's counterclaim was not an attempt to retroactively redefine the parties' relation in order to claim the benefits of a legal marriage, but rather a claim to have similar common-law property rights as others that were not in a cohabiting, unmarried relationship. *Id.* ¶ 38. Accordingly, the appellate court vacated the circuit court's *Hewitt*-based dismissal of the counterclaim and remanded the matter to the circuit court to consider additional arguments raised by the parties. *Id.* ¶ 40.

¶ 16    We will discuss the remaining relevant facts of this case within our discussion.

¶ 17                              ANALYSIS

¶ 18    Blumenthal's central argument on this appeal is that the circuit court's order dismissing Brewer's counterclaim was proper and should not have been disturbed because it was mandated by this court's decision in *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979), and the prohibition against common-law marriage set forth in section 214 of the Marriage and Dissolution Act (750 ILCS 5/214 (West 2010)). Blumenthal asserts that in reversing the circuit court and remanding for further proceedings, the appellate court misread *Hewitt*, improperly reinstated common-law marriage in contravention of Illinois law, and usurped public policy determinations that properly belong to the legislature. Blumenthal also criticizes the appellate court's decision for improperly extending principles of unjust enrichment.

¶ 19    In undertaking our review, we begin by noting that the circuit court's rejection of Brewer's counterclaim was made in the context of a motion to dismiss under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)). Such motions challenge the legal sufficiency of a pleading based on defects apparent on its face. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. In ruling on a section 2-615 motion, a court must accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts. *Beacham v. Walker*, 231 Ill. 2d 51, 57-58 (2008). It is well understood that the critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. Such orders granting motions to dismiss under section 2-615 are reviewed *de novo*. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34.

¶ 20                    Counterclaim Counts I, II, IV, and V

¶ 21    As a preliminary matter, Blumenthal contends the issue of whether counts I, II, IV, and V of Brewer's counterclaim are viable under *Hewitt* should not have been addressed by the appellate court and is not properly before us. We agree. As to those four counts, the appellate court's judgment is fatally flawed for two fundamental reasons unrelated to *Hewitt*.

¶ 22    First, the appellate court lacked jurisdiction to entertain the appeal from dismissal of those counts. The Illinois Constitution confers on the appellate court jurisdiction to hear appeals from all final judgments entered in the circuit court. See Ill. Const. 1970, art. VI, § 6 (providing that appeals "from final judgments of a Circuit Court are a matter of right to the Appellate Court"). The constitution also grants this court the right to "provide by rule for appeals to the Appellate Court from other than final judgments." *Id.* Accordingly, absent a supreme court rule, the appellate court is without jurisdiction to review judgments, orders, or decrees that are not final. *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, ¶ 9.

¶ 23    The ruling at issue here was brought before the appellate court based on Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), which authorizes appeals from final judgments that do not dispose of an entire proceeding "if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." An order or judgment is considered to be final and appealable for purposes of this rule if it terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on

the entire controversy or a separate part thereof. *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008). The purpose of the rule is " 'to discourage piecemeal appeals in the absence of a just reason and to remove the uncertainty which existed when a final judgment was entered on fewer than all of the matters in controversy.' " *Id.* (quoting *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 465 (1990)).

¶ 24    Although the circuit court in this case made the written finding required by Rule 304(a), that finding is not dispositive. By its terms, Rule 304(a) applies only to final judgments or orders. The special finding contemplated by the rule will make a final order appealable, but it can have no effect on a nonfinal order. *Kellerman v. Crowe*, 119 Ill. 2d 111, 115 (1987). If the order is in fact not final, inclusion of the special finding in the trial court's order cannot confer appellate jurisdiction. *EMC Mortgage Corp.*, 2012 IL 113419, ¶ 14.

¶ 25    The circuit court's action dismissing counts I, II, IV, and V of Brewer's counterclaim did not qualify as a final judgment or order. As mentioned above, to be considered final and appealable for purposes of Rule 304(a), a judgment or order must terminate the litigation between the parties on the merits of the cause, so that, if affirmed, the trial court only has to proceed with execution of the judgment. *Kellerman*, 119 Ill. 2d at 115. While the order need not dispose of all the issues presented by the pleadings, it must be final in the sense that it disposes of the rights of the parties, either upon the entire controversy or upon some definite and separate part thereof. *Id.* The circuit court's dismissal of counts I, II, IV, and V did not meet that requirement.

¶ 26    Counts I, II, IV, and V arose from the same set of operative facts and sought precisely the same thing as the underlying cause of action asserted by Blumenthal: division of the value of the parties' Chicago home. Rather than being distinct and separate from Blumenthal's action, these counts merely advanced different analytical approaches for determining how the home or its proceeds should be allocated between the parties. They were, in effect, different iterations of the very same claim. When they were dismissed, the ultimate question—how the value of the residence should be split—remained unresolved. The dismissal served only to narrow the criteria applicable to that decision.

¶ 27    Although we have found no cases directly on point, our appellate court has recognized that where one claim based on the same operative facts is stated differently in multiple counts, the dismissal of fewer than all counts is not a final judgment as to any of the party's claims as required by Rule 304(a). See *Davis v. Loftus*, 334 Ill. App. 3d 761, 766 (2002). Similarly, we have held that where an order disposes only of certain issues relating to the same basic claim, such a ruling is not subject to review under Rule 304(a). To the contrary, permitting separate appeals of such orders promotes precisely the type of piecemeal appeals Rule 304(a) was designed to discourage. See *In re Marriage of Leopando*, 96 Ill. 2d 114, 119-20 (1983). Based on this reasoning, the portion of the circuit court's order dismissing counts I, II, IV, and V of Brewer's counterclaim was not appealable under Rule 304(a).

¶ 28    Second, even if the appellate court had jurisdiction to review the dismissal of counts I, II, IV, and V, its resolution of the appeal was improper and cannot stand. As discussed, the appellate court's conclusion that the circuit court erred in dismissing those counts was predicated on its repudiation of this court's decision in *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979). The appellate court's rejection of *Hewitt* was tantamount to overruling that decision. However, overruling a decision by the Illinois Supreme Court is an action the appellate court

has no authority to take. *People v. Artis*, 232 Ill. 2d 156, 164 (2009) ("The appellate court lacks authority to overrule decisions of this court, which are binding on all lower courts."). While the appellate court was free to question *Hewitt* and recommend that we revisit our holding in the case, under the judicial system created by the Illinois Constitution, it could not, itself, declare that one of our decisions was no longer controlling authority. As we have recently explained,

> "The judicial article of the Illinois Constitution of 1970, like its predecessor in the constitution of 1870, creates a three-tiered court system, with the appellate court sitting in review of the circuit courts, and the supreme court sitting in review of the appellate and circuit courts. Ill. Const. 1970, art. VI. A fundamental principle flows from this hierarchical structure: 'Where the Supreme Court has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases.'" (Emphasis in original.) *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 38 (quoting *Agricultural Transportation Ass'n v. Carpentier*, 2 Ill. 2d 19, 27 (1953)).

¶ 29 Accordingly, even if the appellate court disagreed with *Hewitt*, it remained bound by that decision and should have left it to this court to reassess the decision's validity.

¶ 30 Because the appellate court's reversal of the dismissal of counts I, II, IV, and V of Brewer's counterclaim was predicated on the exercise of jurisdiction it did not possess and the repudiation of legal precedent it had no authority to overrule, we would normally be inclined to simply vacate its ruling as to those counts and remand to the circuit court for further proceedings. In this case, however, a remand would serve no purpose. That is so because while Brewer was pursuing this appeal, she and Blumenthal continued to litigate the underlying partition action. The matter of how the home should be divided has now been finally determined by the circuit court.

¶ 31 Initially, Brewer recognized that resolution of the underlying partition action could affect her counterclaim and therefore moved for a stay of the proceedings on the partition until appeal of the dismissal of her counterclaim was resolved. Although the circuit court denied the stay, it indicated that the question of a stay could be revisited if Brewer posted an appeal bond. From the record, it appears that Brewer elected not to exercise that option. Instead, the partition action proceeded to trial on the merits in August 2014.

¶ 32 The partition trial was conducted over a three-day period. In the course of the trial, testimony was presented regarding when the home was purchased, who contributed to the earnest money and down payment for the purchase, which of the parties and their children lived in the home and when, the cost of upkeep and repairs and who paid those costs, how and when certain other personal and real property was divided by the parties, the disposition of inheritances Brewer received from her parents, and how Brewer and Blumenthal handled their respective finances, including joint investment accounts. The court heard the circumstances of the parties' breakup; listened to analyses of real estate values and market conditions in the neighborhood; and received evidence regarding the parties' income taxes and the source and amounts of mortgage payments, insurance, utilities and taxes on the property. The circuit court then took the matter under advisement.

¶ 33    On October 9, 2014, the circuit court reconvened to share its findings with the parties. After dealing with some minor issues regarding various items of personal property, including photographs and skis, the court turned to the issue of the home. It concluded that the parties had held the property as tenants in common; that its current market value was $1 million; that Blumenthal had paid the earnest money and down payment for the purchase of the home, an amount which totaled $235,000; and that Blumenthal was entitled to return of that sum.

¶ 34    Subtracting the $235,000 from the home's $1 million value left $765,000. The court held that this sum should be split evenly between the parties, giving each of them a claim to $382,500 of the home's value. The court further held, however, that this distribution was subject to various adjustments. Noting that this had been a romantic domestic relationship that had gone sour, the court rejected Blumenthal's argument that Brewer should have to pay her rent for the time she remained in the home after Blumenthal decided to move out. At the same time, the court thought it inappropriate to compensate Brewer for the value of the work she did on the home herself. On the other hand, the court opined that Brewer should receive credits for mortgage payments, taxes, and insurance, as well as for various maintenance and repair expenses incurred by her that were necessary for the home's proper upkeep. The court computed these credits to total $151,700.55, which it believed should be deducted from Blumenthal's $382,500 share of the home's net value after subtraction of the down payment and earnest money, and added to Brewer's share. This left Blumenthal with $230,799.45 of what the court referred to as the home's "equity" and Brewer with $534,200.55. Finally, the court indicated that it would give Brewer the option of buying out Blumenthal's share of the Chicago home. If Brewer declined to exercise that option, the property would be put on the market and sold. A written order to that effect was entered by the court after the hearing concluded.

¶ 35    Neither party appealed. Instead, Brewer elected to buy out Blumenthal's share in accordance with the valuations made by the circuit court. According to public records of which we can take judicial notice, Blumenthal and Blumenthal's civil union partner issued a quitclaim deed to Brewer in January 2015. Brewer subsequently conveyed her interest in the home to a trust.

¶ 36    Because no appeal was taken from the court's judgment setting the value of the home and allocating the home's equity between the parties and because the property has now been conveyed in a manner chosen by the parties in accordance with the court's judgment, Brewer's arguments regarding the legal sufficiency of counts I, II, IV, and V of her counterclaims have been rendered moot. A matter becomes moot on review when, because of events occurring after the appeal was filed, there is no longer an actual controversy or the reviewing court cannot grant the complaining party effectual relief. *In re Marriage of Donald B.*, 2014 IL 115463, ¶ 23. Such is the case here.

¶ 37    Whatever our view might be of the merits of Brewer's legal theories on which counts I, II, IV, and V of her counterclaim are based, the outcome of the case would not change. As noted earlier, those theories were all directed at how the value of the home should be divided. That division has now been made and is final. Brewer obtained financing, the trust she established now owns the house, and Blumenthal has been paid for her interest in it. The deal is done. The object of the controversy has been settled.

¶ 38     Brewer has suggested that the matter is not moot because if we ruled in her favor, the circuit court could undo its final judgment, set aside the partition, and consider anew how the value of the home should be divided. Pressed at oral arguments, Brewer did not explain (and we still do not see) how this could possibly be so.

¶ 39     The finality of the judgment in the underlying partition action was not affected by Brewer's election to seek review of the dismissal of her counterclaim by means of Rule 304(a). Had Brewer wanted to avoid that result and defer final resolution of how the value of the home should be allocated until the viability of her alternate theories was resolved, she could have immediately appealed the circuit court's denial of her motion to stay the underlying case. Under established Illinois law, the denial of a stay of trial court proceedings is treated as a denial of a request for a preliminary injunction and is appealable as a matter of right under Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010). See, *e.g.*, *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶¶ 32-33; *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 69-70 (2007).

¶ 40     In addition, and more importantly, if Brewer believed that the circuit court's subsequent ruling disposing of the home was legally deficient for failing to take into account the theories advanced in her counterclaim, she could have appealed the circuit court's final judgment in the underlying case pursuant to Illinois Supreme Court Rules 301 and 303 (Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. Jan. 1, 2015)). She did not do that either. Rather, she accepted the circuit court's partition ruling, bought out Blumenthal's share of the property for the amount specified by the court, and continued to reside there, as the court gave her the option of doing.

¶ 41     Having pursued this strategy, Brewer would be foreclosed from pursuing counts I, II, IV, and V of her counterclaim even if we agreed that those counts should not have been dismissed based on *Hewitt*. Because the partition action proceeded to final judgment and no appeal from that judgment was taken, reinstatement of counts I, II, IV, and V of the counterclaim would be tantamount to permitting Brewer to proceed with a new and separate action with respect to division of the home's value. That is impermissible.

¶ 42     Under the doctrine of *res judicata*, a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998). A cause of action is defined by the facts which give rise to a right to relief. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 10. " '[S]eparate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief.' " *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 46 (quoting *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d at 311). These principles extend to claims arising from the same operative facts as the plaintiff's claim that were or could have been raised by the defendant, and it has been held that *res judicata* bars a subsequent action if successful prosecution of that action would, in effect, nullify the judgment entered in the original action. See *Corcoran-Hakala v. Dowd*, 362 Ill. App. 3d 523, 530-31 (2005). That, of course, is precisely what would happen if the appellate court's reinstatement of counts I, II, IV, and V were upheld by this court and Brewer ultimately prevailed.

¶ 43    Moreover, even if resuscitation of counts I, II, IV, and V of the counterclaim were viewed as a mere continuation of the same proceeding rather than commencement of a new action, revisiting the merits of those counts would still be foreclosed. As previously indicated, Brewer could have sought an immediate appeal of the circuit court's denial of her request for a stay of the partition action or filed an appeal from the circuit court's judgment finally disposing of the partition action on the merits. She did neither. Instead, Brewer permitted that judgment to stand unchallenged, accepted the court's division of the home's value, and purchased Blumenthal's interest in the property in accordance with the circuit court's ruling. Where, as here, a party fails to challenge a legal decision when it has the opportunity to do so, that decision, as a general rule, becomes "the law of the case for future stages of the same litigation, and [that party is] deemed to have waived the right to challenge that decision at a later time. [Citations.]" (Internal quotation marks omitted.) *Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 547 (1997). The law-of-the-case doctrine bars relitigation of issues of both law and fact. *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, ¶ 8. Similarly, it is well established that if a party proceeds to trial and voluntarily accepts the benefit of a judgment in his or her favor with respect to the disposition of property, that party is precluded from later challenging that judgment, including sufficiency of the property's valuation. See *County of Cook v. Malysa*, 39 Ill. 2d 376, 379 (1968). Brewer, therefore, is precluded from further litigating the disposition of the parties' home. Accordingly, the appellate court should not have entertained her appeal from the dismissal of counts I, II, IV, and V of her counterclaim, and its ruling as to the viability of those counts must be vacated.

¶ 44                              Counterclaim Count III

¶ 45    Unlike counts I, II, IV, and V, count III of Brewer's counterclaim asserts a separate and distinct claim that does not concern the partition or value of the Chicago home. Instead, count III requests that the court impose a "Constructive Trust on Blumenthal's Medical Practice to Remedy Unjust Enrichment Or, in the Alternative, for Restitution." Therefore, the portion of the circuit court's order dismissing count III of Brewer's counterclaim was final and appealable under Rule 304(a). See *Kellerman v. Crowe*, 119 Ill. 2d 111, 115 (1987).

¶ 46    According to count III, "[t]hroughout the course of their relationship, Brewer and Blumenthal commingled their savings and investments." It was the funds from this joint account that went toward the purchase of Blumenthal's ownership interest in her medical practice group, Gynecologic Specialists of Northwestern, S.C. (GSN). Brewer contends that she allowed Blumenthal to use their joint account for this investment with the reasonable understanding and expectation that she, Brewer, would continue to benefit from the earnings derived from GSN. Once the couple ended their relationship in 2008, these financial benefits ceased, and Blumenthal retained the entire interest in the medical group, thereby keeping all of the earnings from the medical practice. Based on these allegations, Brewer claims that Blumenthal is unjustly enriched. Therefore, Brewer requests that this court create a constructive trust from Blumenthal's share of the annual net earnings of the medical group or any portion of the proceeds from any sale of Blumenthal's interest in the group that was attributable to Brewer's earnings or inheritance during their relationship and that this court award her the annual net earnings of GSN attributable to her as well as award her this portion of the proceeds from any sale of Blumenthal's interest in GSN.

¶ 47 " 'A constructive trust is one raised by operation of law as distinguished from a trust created by express agreement between the settlor and the trustee.' " *Suttles v. Vogel*, 126 Ill. 2d 186, 193 (1988) (quoting *Perry v. Wyeth*, 25 Ill. 2d 250, 253 (1962)). A constructive trust is an equitable remedy, which may be imposed where the person in possession of the property would be unjustly enriched if he or she were permitted to retain that property. *In re Liquidation of Security Casualty Co.*, 127 Ill. 2d 434, 447 (1989). The sole duty of the constructive trustee is to transfer title and possession of the wrongfully acquired property to the beneficiary. *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 299 (2000).

¶ 48 Blumenthal argues that the Medical Corporation Act (805 ILCS 15/1 *et seq.* (West 2010)) and the Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 2010)) prohibit Brewer, a licensed attorney, from being a beneficiary of a constructive trust created on her ownership interest in GSN, unless Brewer is also a licensed doctor. Under the Medical Corporation Act, anyone who is not licensed pursuant to the Medical Practice Act is prohibited from having any part in the "ownership, management, or control" of a medical corporation. 805 ILCS 15/13 (West 2010). In addition, fee-splitting arrangements between a licensed medical doctor and a nonlicensed medical doctor are likewise prohibited under the Medical Practice Act. 225 ILCS 60/22.2 (West 2010).

¶ 49 Brewer's counterclaim explains that GSN is an Illinois corporation that characterizes itself as an all-woman practice of experienced physicians dedicated to providing comprehensive health care to women. Blumenthal is licensed under the Medical Corporation Act as a medical doctor, which allowed her to be one of the six owners of GSN. The statutory rule is clear: As an owner of the medical group, Blumenthal is prohibited from transferring any of her ownership interest or any proceeds from a sale of her interest in GSN to a nonlicensed medical doctor. These prohibitions are similar to the prohibitions of a lawyer forming a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law (Ill. R. Prof'l Conduct (2010) R. 5.4(b) (eff. Jan. 1, 2010)) or the prohibition of sharing legal fees with a nonlawyer (Ill. R. Prof'l Conduct (2010) R. 5.4(a) (eff. Jan. 1, 2010)). Because Brewer is not a licensed medical doctor, transferring title and possession of Blumenthal's interest in GSN through a constructive trust to Brewer is unattainable due to the prohibitions of the Medical Corporation Act and the Medical Practice Act.

¶ 50 In the alternative, Brewer requests the common-law remedy of restitution for an undisclosed amount of funds she deposited into the couple's joint account since the year 2000, which was used to purchase Blumenthal's ownership interest in GSN. Brewer raises the same arguments she made before the appellate court, which ruled in her favor, permitting her to bring common-law remedies against Blumenthal. Therefore, Brewer requests this court uphold the appellate court's review of the longstanding public policy in Illinois barring unmarried, cohabiting partners from seeking common-law property rights if the claims are not independent from the parties' relationship.

¶ 51 To understand Illinois's public policy concerning the common-law rights of unmarried, cohabiting couples, we must begin with a review of the history in Illinois concerning the matter—a history the parties and *amici* have extensively outlined in their briefs. One thing is certain as argued in the briefs: Illinois's statutory prohibition of common-law marriage and

- 11 -

this court's prior decision in *Hewitt* are imperative to resolving the issue before this court. We therefore turn to that matter.

¶ 52    Common-law marriages are invalid in Illinois and have been since the early part of the last century. The prohibition is statutory and unequivocal. Section 214 of the Marriage and Dissolution Act (750 ILCS 5/214 (West 2010)) expressly provides that "[c]ommon law marriages contracted in this State after June 30, 1905 are invalid."

¶ 53    Prior to this legislative enactment, the doctrine of common-law marriage was a judicially sanctioned alternative to formal marriage. *People v. Shaw*, 259 Ill. 544, 548 (1913). In *Hewitt*, decided in 1979, this court undertook an extensive and in-depth public policy analysis with respect to the statutory change by which common-law marriages were abolished.

¶ 54    At issue in *Hewitt* was whether public policy barred the granting of common-law relief to plaintiff Victoria Hewitt, who was in a cohabiting, marriage-like relationship with the defendant, Robert Hewitt. *Hewitt*, 77 Ill. 2d at 52. Victoria and Robert commenced their relationship in 1960, while they were attending college in Iowa. *Id.* at 53. After Victoria became pregnant, Robert proclaimed to Victoria "that they were husband and wife and would live as such, no formal ceremony being necessary, and that he would 'share his life, his future, his earnings and his property' with her." *Id.* The parties immediately began holding themselves out as a married couple. *Id.* Relying on Robert's promises, Victoria began to assist in paying for Robert's education and establishing a dental practice, helping him earn more than $80,000 annually and accumulate large amounts of property, owned either jointly with Victoria or separately. *Id.* at 53-54.

¶ 55    After several years together, the relationship became sour, and Victoria filed for divorce, which the circuit court dismissed because the parties were never married. *Id.* at 52. Victoria filed an amended complaint that sought an equitable one-half share of the parties' assets, based upon theories of implied contract, constructive trust, and unjust enrichment, which resulted from their "family relationship." *Id.* at 53. The circuit court dismissed the amended complaint, "finding that Illinois law and public policy require such claims to be based on a valid marriage." *Id.* at 54.

¶ 56    The appellate court reversed, giving considerable weight to the fact that the parties had held themselves out as a couple for over 15 years and lived "a most conventional, respectable and ordinary family life." *Hewitt v. Hewitt*, 62 Ill. App. 3d 861, 863 (1978). The appellate court noted that the "single flaw" of Robert's and Victoria's relationship was the lack of a valid marriage. *Id.* The appellate court concluded that Victoria should not be denied relief based on public policy grounds. *Id.* at 867, 869. Adopting the reasoning of the "widely publicized" case of *Marvin v. Marvin*, 557 P.2d 106 (Cal. 1976), the appellate court held that the amended complaint stated a cause of action on an express oral contract. *Hewitt*, 62 Ill. App.   at 868. In *Marvin*, Michelle Marvin and actor Lee Marvin cohabited for seven years before Michelle sought, by way of a contract action, to enforce Lee's oral promise that they would share earnings and property for life. *Marvin*, 557 P.2d at 110. In resolving her claim for one-half the property accumulated in defendant's name during that period, the California court held that nonmarital cohabitants should be treated "as any other persons" and that contracts between them are valid and enforceable so long as they are not solely and

exclusively based on sexual services, *i.e.*, prostitution. *Id.* at 116. Consequently, the appellate court reversed and remanded the case. *Hewitt*, 62 Ill. App. 3d at 869.

¶ 57 On appeal to this court, we unanimously reversed the appellate court's decision. *Hewitt*, 77 Ill. 2d at 66. Addressing the issue of whether the granting of common-law relief to the plaintiff, an unmarried cohabitant, was barred by public policy, we began by acknowledging that:

"The issue of unmarried cohabitants' mutual property rights *** cannot appropriately be characterized solely in terms of contract law, nor is it limited to considerations of equity or fairness as between the parties to such relationships. There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage." *Id.* at 57-58.

¶ 58 In our view, the legislature intended marriage to be the only legally protected family relationship under Illinois law, and permitting unmarried partners to enforce mutual property rights might "encourage formation of such relationships and weaken marriage as the foundation of our family-based society." *Id.* at 58. This court was concerned that permitting such claims might raise questions about support, inheritance rights, and custody of nonmarital children.[1] *Id.* We noted that the situation between the unmarried couple was "not the kind of arm's length bargain envisioned by traditional contract principles, but an intimate arrangement of a fundamentally different kind." *Id.* at 61. Because the question concerned changing the law governing the rights of parties in the delicate area of marriage-like relationships, which involves evaluations of sociological data and alternatives, this court decided that the underlying issue was best suited to the superior investigative and fact-finding facilities of the legislative branch in the exercise of its traditional authority to declare public policy in the domestic relations field. *Id.* Accordingly, this court held that Victoria's claims were "unenforceable for the reason that they contravene the public policy, implicit in the statutory scheme of the Illinois Marriage and Dissolution of Marriage Act, disfavoring the grant of mutually enforceable property rights to knowingly unmarried cohabitants." *Id.* at 66. We reasoned that an opposite outcome of judicially recognizing mutual property rights between knowingly unmarried cohabitants—where the claim is based upon or intimately related to the cohabitation of the parties—would effectively reinstate common-law marriage and violate the public policy of this state since 1905, when the legislature abolished common-law marriage. *Id.* at 65-66.

¶ 59 Notably, based on our understanding of the public policy in Illinois and the legislative prohibition of common-law marriage, we emphatically rejected the holding in *Marvin* on

_____

[1]The *Hewitt* court also questioned and considered the history of whether granting legal rights to cohabiting adults would encourage "what have heretofore been commonly referred to as 'illicit' or 'meretricious' relationships," which could weaken the institution of marriage. *Hewitt*, 77 Ill. 2d at 58. Today, this court does not share the same concern or characterization of domestic partners who cohabit, nor do we condone such comparisons. Nonetheless, as explained herein, a thorough reading of *Hewitt* makes clear that the core reasoning and ultimate holding of the case did not rely nor was dependent on the morality of cohabiting adults.

- 13 -

which the appellate court relied. *Id.* In doing so, we found that provisions of the Marriage and Dissolution Act—retaining fault as grounds for dissolution of marriage and allowing an unmarried person to acquire the rights of a legal spouse only if he or she goes through a marriage ceremony and cohabits with another in the good-faith belief that he is validly married—indicated the public policy and the judgment of the legislature disfavoring private contractual alternatives to marriage or the grant of property rights to unmarried cohabitants. *Id.* at 64. In rejecting Victoria's public policy arguments, this court recognized that cohabitation by the unmarried parties may not prevent them from forming valid contracts about independent matters, for which sexual relations do not form part of the consideration and do not closely resemble those arising from conventional marriages. *Id.* at 59. However, that was not the type of claim Victoria brought; thus, her claim failed.

¶ 60    The facts of the present case are almost indistinguishable from *Hewitt*, except, in this case, the parties were in a same-sex relationship. During the course of their long-term, domestic relationship, Brewer alleges that she and Blumenthal had a relationship that was "identical in every essential way to that of a married couple." Although the parties were not legally married, they acted like a married couple and held themselves out as such. For example, the former domestic partners exchanged rings as a symbol of their commitment to each other, executed wills and trusts, each naming the other as the sole beneficiary of her assets, and appointed each other as fiduciary for financial and medical decision making. Blumenthal and Brewer also began to commingle their personal and financial assets, which allowed them to purchase investment property as well as the Chicago home where they raised their three children. Much like in *Hewitt*, Brewer alleges that she contributed to Blumenthal's purchase of an ownership interest in the medical group GSN, helping Blumenthal earn the majority of income for the parties and "thereby guaranteeing the family's financial security." Because Blumenthal was able to earn a high income, Brewer was able to devote more time to raising the couple's children and to attend to other domestic duties. Once Blumenthal's and Brewer's relationship ended, Brewer, like Victoria Hewitt, brought suit seeking various common-law remedies to equalize their assets and receive an interest in Blumenthal's business.

¶ 61    As explained *supra*, our decision in *Hewitt* did no more than follow the statutory provision abolishing common-law marriage, which embodied the public policy of Illinois that individuals acting privately by themselves, without the involvement of the State, cannot create marriage-like benefits. *Hewitt* clearly declared the law on the very issue in this case. Yet, the appellate court in this case declined to follow our ruling, despite the facts being almost identical to *Hewitt*. This was improper. Under the doctrine of *stare decisis*, when this court "has declared the law on any point, *it alone can overrule and modify its previous opinion*, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases." (Emphasis in original.) (Internal quotation marks omitted.) *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 38. The appellate court had no authority to depart from our decision. It could question *Hewitt* and recommend that we revisit our holding in the case, but it could not overrule it.

¶ 62    The appellate court was also ill-advised to adopt the reasoning in *Marvin* (2014 IL App (1st) 132250, ¶ 31), given that in *Hewitt* we unquestionably rejected *Marvin*. *Hewitt*, 77 Ill. 2d at 65-66. Determining that the legislature deliberately declined to follow the reasoning in *Marvin*, this court noted that during the time *Marvin* was being decided the Illinois

legislature adopted the civil-law concept of the putative spouse, which involves a situation where a person goes through a marriage ceremony and cohabits with another in the good-faith belief that he or she is validly married. *Id.* at 64. Once the putative spouse learns that the marriage is not valid, his status as a putative spouse terminates because "common law marriages are expressly excluded." *Id.* This enactment was essential to *Hewitt*'s holding because it provided specific evidence of the General Assembly's intent to depart from *Marvin*'s pure contract theory. In light of our legislative review, we felt judicial policy making in this area to be inappropriate in light of the "recent and unmistakeable legislative judgment disfavoring the grant of mutual property rights to knowingly unmarried cohabitants." *Id.* It was our judgment that granting relief under the facts of the case would be contrary to the legislative intent at the time and would have the practical effect of reinstating common-law marriage in Illinois. *Id.* at 65.

¶ 63        When considering the property rights of unmarried cohabitants, our view of *Hewitt*'s holding has not changed. As in *Hewitt*, the issue before this court cannot appropriately be characterized solely in terms of contract law, nor is it limited to considerations of equity or fairness as between the parties in such marriage-like relationships. *Id.* at 57-58. These questions undoubtedly involve some of the most fundamental policy concerns in our society. Permitting such claims, as sought by Brewer, would not only impact the institution of marriage but also raise questions pertaining to other family-related issues. See *id.* at 58. Moreover, Brewer's argument that her relationship with Blumenthal should not be viewed differently from others who cohabit, like roommates or siblings living together, ignores the fact that their relationship—which lasted almost three decades and involved raising three children—*was* different from other forms of cohabitation. Brewer herself identified in her counterclaim that her relationship with Blumenthal was not that of roommates or siblings living together but was "identical in every essential way to that of a married couple."

¶ 64        Because rejection of *Hewitt* is essential to her counterclaim, Brewer requests that we revisit the decision and overrule it. The rationale, analysis, or distinctions that can be drawn from the following appellate court cases are helpful in explaining why we reject Brewer's invitation to overrule *Hewitt* and hold that it remains good law.

¶ 65        Shortly after *Hewitt* was decided, in *Spafford v. Coats*, 118 Ill. App. 3d 566 (1983), a decision not mentioned by the appellate court below, plaintiff Donna Spafford filed a complaint against defendant Richard Coats for the creation of a constructive trust, alleging that she purchased or paid the down payment from her own funds for various vehicles. *Id.* at 568. The problem, however, was that the vehicles purchased by Spafford were titled in Coats's name because insurance premiums would be less. *Id.* Spafford and Coats were never married, but they cohabited for more than six years. *Id.* at 568-69. Using *Hewitt* as the basis for its decision, the circuit court directed a verdict in favor of Coats, finding that Spafford failed to state a cause of action. *Id.* at 569-70.

¶ 66        On review, the appellate court reversed, holding that in this particular situation, the nonmarital, cohabiting relationship did not preclude equitable relief on the vehicles purchased primarily by Spafford but titled in Coats's name. *Id.* at 572-73. The *Spafford* court distinguished the case from *Hewitt*, finding that plaintiff's claims were based on evidence that she furnished substantially all of the consideration for the purchase of several vehicles that defendant retained. *Id.* at 572. Instead, the appellate court found Spafford's claims were

- 15 -

substantially independent of the nonmarital relationship between the parties and not based on rights arising from their cohabitation, *i.e.*, Spafford had actually paid for the motor vehicles herself. *Id.* Because Spafford's claims had an economic basis independent of the nonmarital, cohabiting relationship, she was permitted to recover those independent contributions. *Id.* at 572-73.

¶ 67    The appellate court in *Ayala v. Fox*, 206 Ill. App. 3d 538 (1990), was faced with a similar situation as in *Spafford*. Anita Ayala and Lawrence Fox began their long-term relationship in 1976. *Id.* at 539. At Fox's suggestion, they obtained a $48,000 loan to build a home. *Id.* Fox promised Ayala that title to the property would be transferred to them as joint tenants and that Ayala would receive one-half of the equity in the property if they stopped residing together. *Id.* For three years, Ayala made the majority of the loan, tax, and insurance payments; for the next seven years, Ayala and Fox jointly made the payments. *Id.* During the relationship, Fox never transferred title to the couple as joint tenants, nor did he pay Ayala half of the equity in the property. *Id.* Rather, he placed the property in a land trust and kept personal property purchased with the parties' joint funds during the cohabitation. *Id.* After the parties ended their relationship, Ayala filed suit for a one-half interest in the realty and half of the personal property. *Id.* Dismissing the complaint, the circuit court found that *Hewitt* barred claims based on property disputes between cohabitants. *Id.* at 540.

¶ 68    The appellate court affirmed, holding that Ayala was not entitled to an interest in the property because she was seeking recovery based on rights "closely resembling those arising from a conventional marriage," namely an equitable interest in the "marital" residence. *Id.* at 541. The appellate court distinguished the facts of its case from *Spafford*, finding Ayala's claim was intimately related to her nonmarital cohabitation with Fox and, therefore, *Hewitt* barred plaintiff's claims for equitable relief. *Id.* at 541-42.

¶ 69    *Hewitt*'s rationale was also pivotal in *Costa v. Oliven* (365 Ill. App. 3d 244, 245 (2006), *appeal denied*, 221 Ill. 2d 633 (2006) (table)), which involved a case where plaintiff Eugene Costa sued defendant Catherine Oliven, with whom he had lived for 24 years in a " 'quasi-marital' relationship, with 'all the indicia of a marital type relationship, including love, trust, mutual responsibilities and intimacy.' " In this case, Costa alleged that he assumed the role of stay-at-home dad, nurturing and home-schooling their daughter and routinely performing all of the usual activities associated with maintaining an efficient household in order to enable the defendant to work full time. *Id.* In addition, he alleged that during their years together, Oliven took sole title to almost every asset and possession that was acquired through the couple's joint efforts and labor. *Id.* Based on these allegations, Costa requested the imposition of a constructive trust upon real, personal, and intellectual property owned by Oliven as well as an accounting of all income and assets in Oliven's possession and an award of punitive damages in the amount of $250,000. *Id.* at 245-46. Oliven moved to dismiss plaintiff's claims, arguing that his claims were unenforceable based on section 214 of the Marriage and Dissolution Act (750 ILCS 5/214 (West 2004)), which prohibits common-law marriage, and based on this court's decision in *Hewitt. Costa*, 365 Ill. App. 3d at 246. Following the holding in *Hewitt*, the appellate court affirmed the circuit court's dismissal of Costa's complaint, noting that until the legislature enacted changes, this type of complaint would continue to fail. *Id.*

¶ 70    We find that the facts of the case before us today are not only factually similar to *Hewitt* but also similar to *Ayala* and *Costa*. According to Brewer's counterclaim, one of the ways Blumenthal and Brewer's domestic relationship was identical to that of a married couple was, among other things, their decision to "commingle[ ] their personal property and their finances." Beginning around the year 2000, Blumenthal and Brewer, like the parties in *Ayala*, pooled their assets and finances, which were used to make purchases including the arrangement to purchase an ownership interest in GSN. According to Brewer, these purchases were made for the benefit of providing the "family's financial security" and to allow Brewer to devote a substantial amount of her time raising the couple's children. The decision between Blumenthal and Brewer to commingle their finances and use those joint funds to make property and financial investments demonstrates that the funds were economically dependent on the parties' marriage-like relationship.

¶ 71    For about eight years, Brewer never objected to the arrangement, nor does the counterclaim allege that she tried to earmark or record which funds of hers were going specifically toward the purchase of GSN, as if she were a business partner. This was unquestionably because Blumenthal and Brewer wanted to live like a married couple. Both parties voluntarily contributed to the joint account because that is typical of a married couple. The parties' arrangement was made possible because Brewer, like the plaintiff in *Costa*, agreed to forgo advancing her own legal career in order for Blumenthal to pursue entrepreneurial endeavors including the purchase of an ownership interest in GSN. Indeed, Brewer is correct in labeling Blumenthal's and her purchase of GSN as an investment. But it was an investment for the family, which included Blumenthal, Brewer, and their children. It was not an investment between business partners. Nor was it the kind of arm's length bargain envisioned by traditional contract principles. Rather, the arrangement to use the parties' commingled funds was an arrangement of a fundamentally different kind, which, like the arrangement in *Ayala* and *Costa*, is intimately related and dependent on Brewer's marriage-like relationship with Blumenthal.

¶ 72    Additionally, Brewer's claim for restitution in count III is distinguishable from *Spafford*. Unlike the plaintiff in *Spafford*, Brewer does not allege that she contributed substantially all of the funds for the purchase of GSN. In fact, Brewer's counterclaim does not provide a specific amount of funds she contributed to Blumenthal's ownership interest in GSN, nor does Brewer allege that she and Blumenthal somehow attempted to keep their contributions separate. Rather, the purchase came after many years of the former domestic partners living together, raising a family, and depositing funds in their joint account as well as making certain family purchases out of the joint account. It is undeniable that the purchase of Blumenthal's ownership interest in GSN was dependent on the parties' relationship, because the purchase was made for the family's financial security. That was not the situation in *Spafford*.

¶ 73    While we acknowledge that restitution may be a remedy available to a party who has cohabited with another (see *Hewitt*, 77 Ill. 2d at 55-56), that is not the circumstance concerning Brewer's restitution claim in count III of her counterclaim. We find that Brewer failed to make a showing that count III of her counterclaim has an independent economic basis apart from the parties' relationship. The joint account used by Blumenthal and Brewer to purchase an ownership interest in GSN was dependent on their desire to live in a marriage-like relationship and make purchases out of this account to better their family

situation. Therefore, the purchase of Blumenthal's ownership interest in GSN from the joint account is intimately related to the parties' relationship. Our decision in *Hewitt* bars such relief if the claim is not independent from the parties' living in a marriage-like relationship for the reason it contravenes the public policy, implicit in the statutory scheme of the Marriage and Dissolution Act, disfavoring the grant of mutually enforceable property rights to knowingly unmarried cohabitants. *Id.* at 66.

¶ 74    Next, Brewer respectfully asks this court to affirm the appellate court's decision, which held in her favor that former cohabitants, who live outside the bonds of marriage but live in a marriage-like relationship, may bring common-law property claims. Central to Brewer's argument are various post-*Hewitt* legislative enactments in Illinois, which she claims indicate that the state's public policy has shifted dramatically in regards to unmarried couples and their children. According to Brewer, the following legislative enactments reveal that the application of *Hewitt* is no longer justified and that the state's evolving public policy now contradicts *Hewitt*'s rule. We disagree.

¶ 75    Since this court's decision in *Hewitt*, the General Assembly has enacted, repealed, and amended numerous family-related statutes. In 1984, the legislature adopted a no-fault ground of divorce based on irreconcilable differences to the Illinois Marriage and Dissolution of Marriage Act. Pub. Act 83-954 (eff. July 1, 1984) (codified at 750 ILCS 5/401(a)(2) (West 2012)). Then in 1985, the Illinois Parentage Act of 1984 provided that "[t]he parent and child relationship, including support obligations, extends equally to every child and to every parent, regardless of the marital status of the parents." Pub. Act 83-1372 (eff. July 1, 1985) (codified at 750 ILCS 45/3 (West 2012)). Additionally, since *Hewitt*, there has been an amendment to the Probate Act of 1975 extending intestate inheritance rights to children of unmarried parents (Pub. Act 80-1429 (eff. Sept. 12, 1978) (codified at 755 ILCS 5/2-2 (West 2012))) and a similar amendment to the Illinois Pension Code, which indicates that children born to unmarried parents are entitled to the same survivor's benefits as other children (Pub. Act 84-1028 (eff. Nov. 18, 1985) (codified at 40 ILCS 5/1-104.2 (West 2012))). Further, Illinois also recognizes the rights of unmarried couples (and individuals) to adopt children. Pub. Act 96-328 (eff. Aug. 11, 2009) (codified at 750 ILCS 50/2 (West 2010)). In 2011, the legislature enacted the Illinois Religious Freedom and Civil Union Act, gave legal status to civil unions, and made such status available to both opposite-sex and same-sex couples. Pub. Act 96-1513 (eff. June 1, 2011) (adding 750 ILCS 75/1 *et seq.* (West 2010)). As of 2014, under the Religious Freedom and Marriage Fairness Act, same-sex couples are now able to marry in Illinois. Pub. Act 98-597 (eff. June 1, 2014) (adding 750 ILCS 80/1 *et seq.* (West 2014)). More recently, the Parentage Act of 1984 was repealed (in its entirety) by the 2015 enactment of Public Act 99-85, which replaced it with the Illinois Parentage Act of 2015. 750 ILCS 45/1 *et seq.* (West 2014) (repealed by Pub. Act 99-85 (eff. Jan. 1, 2016) (adding 750 ILCS 46/101 *et seq.*)). In addition, the Marriage and Dissolution Act, which incorporates the statute prohibiting common-law marriages, underwent a major overhaul this year. Pub. Act 99-90 (eff. Jan. 1, 2016) (amending 750 ILCS 5/101 *et seq.* (West 2014)).

¶ 76    These post-*Hewitt* amendments demonstrate that the legislature knows how to alter family-related statutes and does not hesitate to do so when and if it believes public policy so requires. Nothing in these post-*Hewitt* changes, however, can be interpreted as evincing an intention by the legislature to change the public policy concerning the situation presently before this court. To the contrary, the claim that our legislature is moving toward granting

additional property rights to unmarried cohabitants in derogation of the prohibition against common-law marriage is flatly contradicted by the undeniable fact that for almost four decades since *Hewitt*, and despite all of these numerous changes to other family-related statutes, the statutory prohibition against common-law marriage set forth in section 214 of the Marriage and Dissolution Act (750 ILCS 5/214 (West 2014)) has remained completely untouched and unqualified. That is so even though this court in *Hewitt* explicitly deferred any policy change to the legislature. *Hewitt*, 77 Ill. 2d at 66 (When deciding complex public-policy considerations, such " 'questions are appropriately within the province of the legislature, and *** if there is to be a change in the law of this State on this matter, it is for the legislature and not the courts to bring about that change.' " (quoting *Mogged v. Mogged*, 55 Ill. 2d 221, 225 (1973))).

¶ 77        It is well understood that when the legislature chooses not to amend a statute to reverse a judicial construction, it is presumed that the legislature has acquiesced in the court's statement of the legislative intent. *Wakulich v. Mraz*, 203 Ill. 2d 223, 233 (2003) (quoting *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 49-50 (1998)). Based on this principle, we can presume that the legislature has acquiesced in *Hewitt*'s judicial interpretation of the statute prohibiting marriage-like rights to those outside of marriage. If this court were to recognize the legal status desired by Brewer, we would infringe on the duty of the legislature to set policy in the area of domestic relations. As mentioned in *Hewitt*, the legislative branch is far better suited to declare public policy in the domestic relations field due to its superior investigative and fact-finding facilities, as declaring public policy requires evaluation of sociological data and alternatives. Therefore, we do not find a compelling reason to reverse course now and depart from our earlier legislative interpretation, especially in light of almost two score years of legislative inaction on the matter.

¶ 78        Brewer's argument that we should recognize new public policy justifications to support her counterclaim is further undermined by the fact that all of the public policy changes to which she cites resulted not from judicial action but from the legislature. In each example, it was the legislature, not the courts, that determined what Illinois public policy was (or was not) to be.

¶ 79        We also reject Brewer's argument that changes in law since *Hewitt* demonstrate that the "legislature no longer considers withholding protection from nonmarital families to be a legitimate means of advancing the state's interest in marriage." To the contrary, this court finds that the current legislative and judicial trend is to uphold the institution of marriage. Most notably, within the past year, the United States Supreme Court in *Obergefell v. Hodges*, 576 U.S. ___, ___, 135 S. Ct. 2584, 2604-05 (2015), held that same-sex couples cannot be denied the right to marry. In doing so, the Court found that "new insights [from the developments in the institution of marriage over the past centuries] have strengthened, not weakened, the institution of marriage." *Id.* at ___, 135 S. Ct. at 2596. For the institution of marriage has been a keystone of our social order and "remains a building block of our national community." *Id.* at ___, 135 S. Ct. at 2601. Accordingly, the Court invalidated any state legislation prohibiting same-sex marriage because excluding same-sex couples from marriage would be excluding them "from one of civilization's oldest institutions." *Id.* at ___, 135 S. Ct. at 2608.

- 19 -

¶ 80        While the United States Supreme Court has made clear that "[t]he Constitution *** does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex" (*id.* at ___, 135 S. Ct. at 2607), nothing in that holding can fairly be construed as requiring states to confer on non-married, same-sex couples common-law rights or remedies not shared by similarly situated non-married couples of the opposite sex. Legislatures may, of course, decide that matters of public policy do warrant special consideration for non-married, same-sex couples under certain circumstances, notwithstanding the fact that the institution of marriage is available to all couples equally. What is important for the purposes of this discussion is that the balancing of the relevant public policy considerations is for the legislature, not the courts. Indeed, now that the centrality of the marriage has been recognized as a fundamental right for all, it is perhaps more imperative than before that we leave it to the legislative branch to determine whether and under what circumstances a change in the public policy governing the rights of parties in nonmarital relationships is necessary.

¶ 81        It is well settled that the policy of the Marriage and Dissolution Act gives the state a strong continuing interest in the institution of marriage and the ability to prevent marriage from becoming in effect a private contract terminable at will, by disfavoring the grant of mutually enforceable property rights to knowingly unmarried cohabitants. See *Hewitt*, 77 Ill. 2d at 65-66. As explained in *Hewitt*, such policy was set forth by the enactment of section 214 of the Marriage and Dissolution Act. Ill. Rev. Stat. 1979, ch. 40, ¶ 214 (codified at 750 ILCS 5/214 (West 2010)). Until the legislature sees fit to change our interpretation of the public policy in Illinois, under the circumstances of this case, Brewer's claim for restitution is prohibited, as it contravenes the public policy implicit in the Marriage and Dissolution Act.

¶ 82        Lastly, we note that Brewer, the supporting *amici*, and the partial dissent cite to numerous cases from our sister state courts and other secondary sources that support Brewer's public policy arguments. However, decisions from other state courts and secondary sources are not binding on this court and, in this particular situation, are unpersuasive for the reason they do not adequately consider the deeply rooted public policy in Illinois. *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 55 (citing *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 489 (1989)). Additionally, it should be noted that these cases and secondary sources were written prior to, and therefore did not consider, the fundamental change the United States Supreme Court decision in *Obergefell* had on legal rights of same-sex partners.

¶ 83                              Due Process and Equal Protection Claims

¶ 84        The determination that the trial court did not err in dismissing Brewer's counterclaim does not end this appeal, for Brewer argues that the continued application of *Hewitt*'s rule would violate the Illinois and federal constitutional guarantees of due process and equal protection. See U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, §§ 2, 12. Brewer claims that *Hewitt*'s rule preventing unmarried domestic partners the ability to bring common-law claims available to all other persons, solely because they are in a marriage-like relationship, does not rationally advance a legitimate governmental purpose and that it deliberately seeks to penalize unmarried partners for exercising their constitutionally protected right to enter into an intimate relationship. Although the appellate court did not address this issue, the issue

has been raised and fully briefed by both parties. Therefore, we will address this issue on appeal. *Chavda v. Wolak*, 188 Ill. 2d 394, 400 (1999).

¶ 85 We disagree with Brewer's claim that *Hewitt*'s holding denies unmarried domestic partners the ability to bring common-law claims solely because they are in an intimate relationship with another. See *supra* ¶¶ 65-73. This court's decision in *Hewitt* only disallows unmarried cohabitants who live in a marriage-like relationship from accessing, under the guise of an implied contract, the rights and protections specified in the Marriage and Dissolution Act. In other words, individuals can enter into an intimate relationship, but the relationship itself cannot form the basis to bring common-law claims. Thus, *Hewitt*'s holding does not prevent or penalize unmarried partners from entering into intimate relationships. Rather, it acknowledges the legislative intent to provide certain rights and benefits to those who participate in the institution of marriage.

¶ 86 The State's interest in the creation, regulation, and dissolution of the marriage relationship is beyond question. Over one hundred years ago, the United States Supreme Court in *Maynard v. Hill*, 125 U.S. 190, 211 (1888), recognized that marriage "is the foundation of the family and of society, without which there would be neither civilization nor progress." Throughout history, states have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order. See *Obergefell*, 576 U.S. at ___, 135 S. Ct. at 2601. In *Williams v. North Carolina*, 317 U.S. 287, 298 (1942), the Court noted that "[e]ach state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders." This is so because "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.' " *United States v. Windsor*, 570 U.S. ___, ___, 133 S. Ct. 2675, 2691 (2013) (quoting *Williams*, 317 U.S. at 298). In enacting the Marriage and Dissolution Act (Pub. Act 80-923 (eff. Oct. 1, 1977) (codified at 750 ILCS 5/101 *et seq.* (West 2014))), the Illinois legislature has shown its rightful interest in defining and regulating domestic relationships.

¶ 87 Since marriage is a legal relationship that all individuals may or may not enter into, Illinois does not act irrationally or discriminatorily in refusing to grant benefits and protections under the Marriage and Dissolution Act to those who do not participate in the institution of marriage. As noted in *Hewitt* and the line of cases that follow its holding, unmarried individuals may make express or implied contracts with one another, and such contracts will be enforceable if they are not based on a relationship indistinguishable from marriage. Indeed, *Hewitt* did nothing more than effectuate the policy established by the legislature to prevent knowingly unmarried cohabitants from evading the statutory abolition of common-law marriage under section 214 of the Marriage and Dissolution Act (750 ILCS 5/214 (West 2010)) by employing theories of implied contract to achieve the same result that would occur if common-law marriage were recognized. We, therefore, reject Brewer's claims.

¶ 88                                                        CONCLUSION

¶ 89 For the foregoing reasons, the appellate court should not have considered Brewer's appeal with respect to that portion of the circuit court's order disposing of counts I, II, IV,

- 21 -

and V of Brewer's counterclaim, and it erred when it reversed and remanded the cause with respect to count III of Brewer's counterclaim. The judgment of the appellate court is therefore vacated in part and reversed in part. The judgment of the circuit court dismissing Brewer's counterclaim in full is affirmed.

¶ 90     Appellate court judgment vacated in part and reversed in part.

¶ 91     Circuit court judgment affirmed.

¶ 92     JUSTICE THEIS, concurring in part and dissenting in part:

¶ 93     I agree with the majority's disposition of counts I, II, IV, and V of Judge Brewer's counterclaim against Dr. Blumenthal. I further agree with the majority's holding that count III of the counterclaim cannot proceed on a constructive trust theory. I disagree with the majority's holding that count III cannot proceed on a restitution theory.

¶ 94     The trial court dismissed Brewer's amended complaint in its entirety because it felt bound to *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979). The appellate court did not feel similarly bound, but, as the majority notes, that court should have followed that case. *Supra* ¶ 61 (quoting *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 38). The central question for us to decide here is whether we should do so.

¶ 95     The doctrine of *stare decisis* is not an inexorable command (*Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994)), and this court will depart from it and discard a prior case when there is good cause to do so (*Moehle v. Chrysler Motors Corp.*, 93 Ill. 2d 299, 304 (1982)). Good cause exists when an earlier ruling has proven to be unworkable or poorly reasoned. *People v. Sharpe*, 216 Ill. 2d 481, 520 (2005) (citing *People v. Jones*, 207 Ill. 2d 122, 134 (2003)); see *Vasquez v. Hillery*, 474 U.S. 254, 265-66 (1986) (stating that "any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged to bring its opinions into agreement with experience and with facts newly ascertained" (internal quotation marks omitted)). In my view, there is good cause to overrule *Hewitt*. The court's decision in that case was clouded by an inappropriate and moralistic view of domestic partners who cohabit and founded upon legal principles that have changed significantly.

¶ 96     According to the majority, *Hewitt* "did no more than follow the statutory provision abolishing common-law marriage, which embodied the public policy of Illinois that individuals acting privately by themselves, without the involvement of the State, cannot create marriage-like benefits." *Supra* ¶ 61. In fact, *Hewitt* did much more. It etched into the Illinois Reports the arcane view that domestic partners who choose to cohabit, but not marry, are engaged in "illicit" or "meretricious" behavior at odds with foundational values of "our family-based society." *Hewitt*, 77 Ill. 2d at 58. "Meretricious" means "of or relating to a prostitute" (Webster's Third New International Dictionary 1413 (1986)), so this court labeled such people as prostitutes.

¶ 97     The majority's attempt to distance itself from *Hewitt*'s sweeping and near-defamatory statement is unconvincing. Though the majority assures that "this court does not share the same concern or characterization of domestic partners who cohabit, nor do we condone such comparisons" (*supra* ¶ 58 n.1), its disavowal of *Hewitt* is literally subtextual, occurring only

in a footnote. Elsewhere, the majority borrows troubling language from that case. In *Hewitt*, the court stated that "the situation" between the parties was "not the kind of arm's length bargain envisioned by traditional contract principles, but an intimate arrangement of a fundamentally different kind." *Hewitt*, 77 Ill. 2d at 61. Here, the majority states that the parties' investment into Blumenthal's medical practice was not "the kind of arm's length bargain envisioned by traditional contract principles," but rather "an arrangement of a fundamentally different kind, which *** is intimately related and dependent on Brewer's marriage-like relationship with Blumenthal." *Supra* ¶ 71. The majority cleverly tries to cloak the real meaning of *Hewitt*, but what makes these "arrangements" fundamentally different is the same for the *Hewitt* court and the majority.

¶ 98        To state uncategorically that "our view of *Hewitt*'s holding has not changed" (*supra* ¶ 63) and insist that "it remains good law" (*supra* ¶ 64) is to reaffirm an oddly myopic and moralistic view of cohabitation. The majority assertion that *Hewitt*'s "core reasoning and ultimate holding *** did not rely nor was dependent on the morality of cohabiting adults" (*supra* ¶ 58 n.1) is plainly incorrect because the court's discussion of the role of the legislature in setting public policy on domestic relations and the prohibition of common-law marriage comes as an even-if afterthought. See *Hewitt*, 77 Ill. 2d at 60. Insulating the institution of marriage from the "changing mores of our society" was the clear impetus for our holding in that case. *Id.* at 58.

¶ 99        To begin its analysis, the *Hewitt* court discussed at length the so-called rule of illegality. The court quoted the first Restatement of Contracts, which stated, " 'A bargain in whole or in part for or in consideration of illicit sexual intercourse or of a promise thereof is illegal.' " *Hewitt*, 77 Ill. 2d at 59 (quoting Restatement of Contracts § 589 (1932)). And the court cited the well-known contract law treatise by Arthur Corbin, the reporter of the First Restatement, as further support for the traditional rule. *Id.* (citing 6A Arthur Linton Corbin, Corbin on Contracts § 1476 (1962)). The *Hewitt* court acknowledged that "cohabitation by the parties may not prevent them from forming valid contracts about independent matters, for which it is said the sexual relations do not form part of the consideration" (*id.*), but rejected the "real thrust" of the argument that the rule of illegality should be abandoned (*id.* at 60). The court decried "the naivete *** involved in the assertion that there are involved in these relationships contracts separate and independent from the sexual activity, and the assumption that those contracts would have been entered into or would continue without that activity." *Id.*

¶ 100       *Hewitt*'s support for the rule of illegality has disappeared. In 1979, Illinois still criminalized cohabitation. See Ill. Rev. Stat. 1961, ch. 38, ¶ 11-8 (a "person who cohabits *** commits fornication if the behavior is open and notorious"). The *Hewitt* court did not cite that statute, but quoted *Wallace v. Rappleye*, 103 Ill. 229, 249 (1882), which held, " 'An agreement in consideration of future illicit cohabitation between the [parties] is void.' " *Hewitt*, 77 Ill. 2d at 58-59. When the prohibition against cohabitation was repealed in 1990 (see Pub. Act 86-490 (eff. Jan. 1, 1990) (codified at 720 ILCS 5/11-40 (West 2010))), *Wallace* was, in effect, superseded.

¶ 101       The Second Restatement of Contracts, which was completed in 1979 and published in 1981, deleted the section of the First Restatement quoted in *Hewitt* and ceased to define all bargains between people in intimate relationships as illegal. The section of the Corbin treatise

cited in *Hewitt* has been dropped in the current version. Today, the treatise recognizes that cohabiting adults are a family and notes, "The courts' treatment of contracts entered into by cohabiting parties evolved in the last part of the twentieth century and is clear evidence of how the courts' view of what might be against public policy varies with changes in society's views." 15 Grace McLane Giesel, Corbin on Contracts § 81.4, at 205 (Joseph M. Perillo ed., rev. ed. 2003) (hereinafter Corbin). According to the treatise, courts across the country no longer perceive a conflict between the public policies of protecting and encouraging marriage and discouraging any exchange of sexual activity for value and enforcing agreements between former cohabitants. Corbin, *supra*, § 81.4, at 207-08.

¶ 102     The treatise also refers to the landmark "palimony" case of *Marvin v. Marvin*, 557 P.2d 106 (Cal. 1976) (*en banc*), remarking:

> "Whereas cases decided [prior to] *Marvin* may have presumed that the sexual relationship was the substance of the agreement, cases after *Marvin* seem to presume that the relationship is not the substance of the agreement. These cases are not concerned that the agreement exists in the context of a sexual relationship, but rather are concerned only if the contract's 'primary' reason is sexual relations for value." Corbin, *supra*, § 81.4, at 219.

Brewer and the *amici* supporting her cite many of those cases, but the majority declines to follow them because they are not binding authority and "do not adequately consider the deeply rooted public policy in Illinois." *Supra* ¶ 82. That policy, presumably, is the one mentioned earlier by the majority that individuals acting privately cannot create marriage-like benefits without the involvement of the State. *Supra* ¶ 61. According to the majority, that policy is embodied in prohibition of common-law marriage that "has remained completely untouched and unqualified" in the nearly four decades since *Hewitt*. *Supra* ¶ 76.

¶ 103     Obviously, Illinois's common-law marriage ban is still in effect. See 750 ILCS 5/214 (West 2010). Parallel statutes are in effect across the country,[2] but only Georgia and Louisiana have rulings similar to *Hewitt*. See *Long v. Marino*, 441 S.E.2d 475 (Ga. Ct. App. 1994); *Schwegmann v. Schwegmann*, 441 So. 2d 316 (La. Ct. App. 1983). Courts in a vast majority of the remaining states, as well as the District of Columbia, that have chosen not to recognize common-law marriages also have chosen to recognize claims between former domestic partners like Blumenthal and Brewer. See, *e.g.*, *Bishop v. Clark*, 54 P.3d 804 (Alaska 2002); *Cook v. Cook*, 691 P.2d 664 (Ariz. 1984); *Bramlett v. Selman*, 597 S.W.2d 80 (Ark. 1980); *Marvin v. Marvin*, 557 P.2d 106 (Cal. 1976); *Boland v. Catalano*, 521 A.2d 142 (Conn. 1987); *Mason v. Rostad*, 476 A.2d 662 (D.C. 1984); *Poe v. Estate of Levy*, 411 So. 2d 253 (Fla. Dist. Ct. App. 1982); *Simmons v. Samulewicz*, 304 P.3d 648 (Haw. Ct. App. 2013); *Glasgo v. Glasgo*, 410 N.E.2d 1325 (Ind. Ct. App. 1980); *Donovan v. Scuderi*, 443 A.2d 121 (Md. Ct. Spec. App. 1982); *Wilcox v. Trautz*, 693 N.E.2d 141 (Mass. 1998); *Featherston v. Steinhoff*, 575 N.W.2d 6 (Mich. Ct. App. 1997); *In re Estate of Eriksen*, 337 N.W.2d 671 (Minn. 1983); *Cates v. Swain*, No. 2010-CT-01939-SCT, 2013 WL 1831783 (Miss. May 2, 2013); *Hudson v. DeLonjay*, 732 S.W.2d 922 (Mo. Ct. App. 1987); *Kinkenon v. Hue*, 301

---

[2]According to the National Conference of State Legislatures, only Alabama, Colorado, Iowa, Kansas, Montana, New Hampshire, Oklahoma, Rhode Island, South Carolina, and Texas still recognize common-law marriage. *Common Law Marriage by State*, National Conference of State Legislatures, http://www.ncsl.org/research/human-services/common- law-marriage.aspx (updated Aug. 4, 2014).

N.W.2d 77 (Neb. 1981); *Hay v. Hay*, 678 P.2d 672 (Nev. 1984); *Dominguez v. Cruz*, 617 P.2d 1322 (N.M. Ct. App. 1980); *Morone v. Morone*, 413 N.E.2d 1154 (N.Y. 1980); *Collins v. Davis*, 315 S.E.2d 759 (N.C. Ct. App. 1984), *aff'd per curiam*, 321 S.E.2d 892 (N.C. 1984); *McKechnie v. Berg*, 667 N.W.2d 628 (N.D. 2003); *Beal v. Beal*, 577 P.2d 507 (Or. 1978) (*en banc*); *Knauer v. Knauer*, 470 A.2d 553 (Pa. Super. Ct. 1983); *Bracken v. Bracken*, 217 N.W. 192 (S.D. 1927); *Leek v. Powell*, 884 S.W.2d 118 (Tenn. Ct. App. 1994); *Belcher v. Kirkwood*, 383 S.E.2d 729 (Va. 1989); *In re Marriage of Lindsey*, 678 P.2d 328 (Wash. 1984) (*en banc*); *Goode v. Goode*, 396 S.E.2d 430 (W. Va. 1990); *Watts v. Watts*, 405 N.W.2d 303 (Wis. 1987); *Kinnison v. Kinnison*, 627 P.2d 594 (Wy. 1981).

¶ 104    The recognition of claims between domestic partners has not revived the doctrine of common-law marriage in jurisdictions that have abolished it. See Principles of the Law of Family Dissolution § 6.01 cmt. a (2002) (hereinafter Principles). That is, "the history of common law marriage in this country" (*Hewitt*, 77 Ill. 2d at 64)—or, more precisely, its widespread prohibition—has not prevented courts across the country from allowing such claims to proceed. See *Glasgo*, 410 N.E.2d at 1330 ("We do not find that recognition of a claim for a declaration of property rights in specific property to be a claim which reinstates common law marriages."); *Hay*, 678 P.2d at 674 ("We hasten to point out that Nevada does not recognize common law marriage. [Citation.] We recognize that the state has a strong public policy interest in encouraging legal marriage. We do not, however, believe that policy is well served by allowing one participant in a meretricious relationship to abscond with the bulk of the couple's acquisitions."); *Goode*, 396 S.E.2d at 438 ("This Court *** recognizes that the state has a strong policy interest in encouraging legally valid marriages. [Citation.] However, we *** also recognize that this policy must not defeat a person's equitable interests, nor a person's rights based upon a valid agreement, expressed or implied."); *Kinnison*, 627 P.2d at 595 ("While repeatedly rejecting the doctrine of common-law marriage, this court has never held, however, that the fact that a man and a woman live together out of wedlock and engage in a sexual relationship in any way invalidates agreements between them or, because of the relationship, renders them incapable of contracting with one another."); see also *Boland*, 521 A.2d at 145; *Wilcox*, 693 N.E.2d at 146; *Hudson*, 732 S.W.2d at 926; *Dominguez*, 617 P.2d at 1322-23; *Knauer*, 470 A.2d at 564.

¶ 105    In light of this wave of authority, the Restatement (Third) of Restitution and Unjust Enrichment now contains a new section that provides former domestic partners with an avenue "to prevent unjust enrichment upon the dissolution of the relationship." Restatement (Third) of Restitution and Unjust Enrichment § 28(1) (2011).

¶ 106    Illinois is a clear outlier on this issue. See Principles, *supra*, § 6.03, Reporter's Notes, cmt. b ("Although *Hewitt* is not entirely isolated [citation] its approach is distinctly a minority view, and has been explicitly rejected by many courts ***."). *Hewitt* must be overruled because it is outmoded and out of touch with contemporary experience and opinions on cohabitation.

¶ 107    Additionally, *Hewitt* must be overruled because the legal landscape that formed the background for our decision has changed significantly. The *Hewitt* court was puzzled by the impact that recognizing claims arising from the relationships of unmarried cohabitants would have on society. *Hewitt*, 77 Ill. 2d at 58. Specifically, the court queried, "[W]hat of the

children born of such relationships? What are their support and inheritance rights and by what standards are custody questions resolved? What of the sociological and psychological effects upon them of that type of environment?" *Id.* That court was the same one that decided *Jarrett v. Jarrett*, 78 Ill. 2d 337, 345 (1979), which affirmed a trial court ruling transferring custody of three children to their father because their mother was cohabiting with another man. Four years later in *In re Marriage of Thompson*, 96 Ill. 2d 67, 78 (1983), the court changed course and held that, in Illinois, there is no "conclusive presumption that, because a custodial parent cohabits with a member of the opposite sex, the child is harmed." See also *In re Marriage of R.S.*, 286 Ill. App. 3d 1046, 1055 (1996) ("the clear import of the *Thompson* opinion is that Illinois courts should not adopt absolute rules that require a change in custody based on conduct of the custodial parent that does not impact the children"). Unmarried couples may now adopt children. See 750 ILCS 50/2 (West 2010).

¶ 108    As for support and inheritance, the Probate Act of 1975 was amended in 1978 to extend intestate inheritance rights to children of unmarried parents. See Pub. Act 80-1429 (eff. Sept. 12, 1978) (codified at 755 ILCS 5/2-2 (West 2010)). Similarly, the Illinois Pension Code was amended in 1985 to extend survivor benefits to such children. See Pub. Act 84-1028 (eff. Nov. 18, 1995) (codified at 40 ILCS 5/1-104.2 (West 2010)). And the Illinois Parentage Act of 1984, which also went into effect in 1985, specifically provided that "[t]he parent and child relationship, including support obligations, extends equally to every child and to every parent, regardless of the marital status of the parents." Pub. Act 83-1372 (eff. July 1, 1985) (codified at 750 ILCS 45/3 (West 2010)). That statute has since been repealed and replaced by the Illinois Parentage Act of 2015. 750 ILCS 46 *et seq.* (West Supp. 2015).

¶ 109    To bolster its holding, *Hewitt* relied upon Illinois's rejection of so-called no-fault divorce. See *Hewitt*, 77 Ill. 2d at 63 (citing Ill. Rev. Stat. 1977, ch. 40, ¶ 401). The court took the legislature's decision to retain fault grounds for divorce as a "significantly stronger promarriage policy" that reaffirmed "the traditional doctrine that marriage is a civil contract between three parties[: ]the husband, the wife[,] and the State" and prevented "the marriage relation from becoming in effect a private contract terminable at will." *Hewitt*, 77 Ill. 2d at 63-64.

¶ 110    The Marriage and Dissolution of Marriage Act was amended in 1984, and since then Illinois has had no-fault divorce. See 750 ILCS 5/401(a)(2) (West 2010); see also *Karbin v. Karbin*, 2012 IL 112815, ¶ 39 (stating that the no-fault divorce provisions of the Act signaled a shift in policy that "reflected a dissatisfaction with the traditional requirements of proving fault to obtain a divorce" and "allowed people to part with dignity" (internal quotation marks omitted)). And the Illinois Uniform Premarital Agreement Act was enacted in 1990. See 750 ILCS 10/1 *et seq.* (West 2010); see also *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 517 (2001) (indicating that, historically, premarital agreements that limited spousal maintenance or distributed property upon divorce were invalidated on public policy grounds because they were said to be conducive to divorce, but it is now "clear that there is no longer any general public policy opposed to agreements contemplating divorce"). Those statutes answer the *Hewitt* court's concern about "the marriage relation *** becoming in effect a private contract terminable at will." *Hewitt*, 77 Ill. 2d at 64.

¶ 111    Notably, *Hewitt*'s paternalistic reference to only opposite-gender marriages has been superseded by the Religious Freedom and Marriage Fairness Act (Pub. Act 98-597 (eff. June

1, 2014) (adding, *inter alia*, 750 ILCS 80/5 (West Supp. 2013))), which provides "same-sex and different-sex couples and their children equal access to the status, benefits, protections, rights, and responsibilities of civil marriage." The legislature, in an earlier statute, extended the rights and burdens of marriage to domestic partners who enter civil unions (see 750 ILCS 75/1 *et seq.* (West 2010)), and many public and private employers provide benefits to domestic partners who cohabit.

¶ 112    The majority, however, refuses to give these statutory amendments much weight. According to the majority, "[t]hese post-*Hewitt* amendments demonstrate that the legislature knows how to alter family-related statutes and does not hesitate to do so when and if it believes public policy so requires." *Supra* ¶ 76. The implication is that, in light of the many statutory changes since *Hewitt*, the legislature's silence on the rights of cohabitants somehow indicates its rejection of claims like those brought by Brewer. I interpret that silence differently. Simply because the legislature has taken some action in the domestic relations arena does not mean that this court cannot act as well. See *In re Parentage of M.J.*, 203 Ill. 2d 526, 540 (2003). The legislature is undoubtedly well equipped to declare public policy on domestic relations. *Hewitt*, 77 Ill. 2d at 61, 66; *supra* ¶ 77. Courts, however, are better equipped than the legislature to help parties divide joint assets using familiar legal and equitable rules. See *Watts*, 405 N.W.2d at 311 ("Courts have traditionally developed principles of contract and property law through the case-by-case method of the common law. While ultimately the legislature may resolve the problems raised by unmarried cohabiting parties, we are not persuaded that the court should refrain from resolving such disputes until the legislature gives us direction.").

¶ 113    For more than a century and a half, Illinois courts have adjudicated property disputes between family members. See, *e.g.*, *Miller v. Miller*, 16 Ill. 296, 298-99 (1855); *Collar v. Patterson*, 137 Ill. 403, 407 (1891); *Heffron v. Brown*, 155 Ill. 322, 326 (1895); *Finch v. Green*, 225 Ill. 304, 312 (1907); *Legate v. Legate*, 249 Ill. 359, 364 (1911). Generally, courts have held that, when people live together in a family setting, contributions between them are presumed gratuitous and not compensable absent an express or implied contract. See *In re Estate of Milborn*, 122 Ill. App. 3d 688, 692 (1984) ("The rule rests on the idea of mutual dependence between those who are members of one immediate family ***." (Emphasis omitted.)). Thus, seen in the light of established Illinois law, claims like Brewer's claim are nothing new.

¶ 114    More importantly, claims like Brewer's claim do not implicate the Marriage and Dissolution of Marriage Act and, thus, do not undermine the public policy of Illinois, as expressed in the prohibition of common-law marriage, that individuals themselves cannot create marriage-like benefits. See *supra* ¶ 61. Although the parties had what the majority terms a "marriage-like relationship" (*supra* ¶ 1), Brewer does not seek "marriage-like benefits" (*supra* ¶ 61) or "marriage-like rights" (*supra* ¶ 77) in count III. She simply asks to bring the same common-law claims available to other people. She should be allowed to do so. The fact that Brewer and Blumenthal were once domestic partners should be no impediment. See *Mason*, 476 A.2d at 666 ("the position that the courts will not participate in resolving the disputes in accordance with general principles of law and, thus, will leave the parties to their own devices, to be unrealistic and unresponsive to social need"); *Salzman v. Bachrach*, 996 P.2d 1263, 1268-69 (Colo. 2000) (*en banc*) ("cohabitation and sexual relations alone do not suspend contract and equity principles"). Admittedly, such claims may

be difficult to plead and prove (see Marsha Garrison, *Nonmarital Cohabitation: Social Revolution and Legal Regulation*, 42 Fam. L.Q. 309, 321 (2008)), but that is a matter for the trial court.

¶ 115    *Hewitt*'s flaws, both linguistic and legal, have become more apparent with time. Our holding there is a court-made rule that this court should overrule. I believe that count III of Brewer's amended complaint should be remanded for the trial court to determine whether she has pleaded a cognizable cause of action. For these reasons, I dissent.

¶ 116    JUSTICE BURKE joins in this partial concurrence, partial dissent.

## DISSENT UPON DENIAL OF REHEARING

¶ 117    JUSTICE THEIS, dissenting upon denial of rehearing:

¶ 118    I continue to believe that the majority was wrong to reaffirm *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979). That case should be overruled, and Brewer should be allowed to pursue her restitution claim for the reasons that I stated in my dissent. *Supra* ¶ 96 (Theis, J., concurring in part and dissenting in part, joined by Burke, J.). Further, this court should grant rehearing because the majority mischaracterized Brewer's restitution claim and ignored a key aspect of her constitutional challenge.

¶ 119    The majority opinion rejected that challenge, explaining that *Hewitt*

> "disallows unmarried cohabitants who live in a marriage-like relationship from accessing, under the guise of an implied contract, the rights and protections specified in the Marriage and Dissolution Act. In other words, individuals can enter into an intimate relationship, but the relationship itself cannot form the basis to bring common-law claims." *Supra* ¶ 85.

According to the majority, "*Hewitt* did nothing more than effectuate the policy established by the legislature to prevent knowingly unmarried cohabitants from evading the statutory abolition of common-law marriage *** by employing theories of implied contract to achieve the same result that would occur if common-law marriage were recognized." *Supra* ¶ 87. The majority then concluded that because "marriage is a legal relationship that all individuals may or may not enter into, Illinois does not act irrationally or discriminatorily in refusing to grant benefits and protections under the Marriage and Dissolution Act to those who do not participate in the institution of marriage." *Supra* ¶ 87.

¶ 120    That conclusion is suspect for two reasons. First, the majority mischaracterized Brewer's restitution claim. The majority intimated that Brewer makes a claim under the Illinois Marriage and Dissolution of Marriage Act. She does not. As I stated in my dissent,

> "[C]laims like Brewer's claim do not implicate the Marriage and Dissolution of Marriage Act and, thus, do not undermine the public policy of Illinois, as expressed in the prohibition of common-law marriage, that individuals themselves cannot create marriage-like benefits. See *supra* ¶ 61. Although the parties had what the majority terms a 'marriage-like relationship' (*supra* ¶ 1), Brewer does not seek 'marriage-like benefits' (*supra* ¶ 61) or 'marriage-like rights' (*supra* ¶ 77) in count III. She simply asks to bring the same common-law claims available to other people." *Supra* ¶ 114.

Brewer has not employed an implied contract theory to achieve the same result that she would obtain under section 503 of the Marriage and Dissolution of Marriage Act (750 ILCS 5/503 (West 2014)). She has employed an equitable theory to achieve a just result. Claims like Brewer's claim have long been recognized in Illinois. *Supra* ¶ 113 (Theis, J., concurring in part and dissenting in part, joined by Burke, J.).

¶ 121    Second, the majority ignored the key aspect of Brewer's constitutional challenge. In her response brief, Brewer asserted that applying *Hewitt* to bar her restitution claim would violate due process and equal protection because our holding in that case effectively penalizes unmarried domestic partners who cohabitate for exercising their right to an intimate relationship, as recognized by the United States Supreme Court in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003). Consequently, *Hewitt*'s holding is not rationally related to a legitimate governmental interest. Brewer added that it would be "particularly irrational" to expand *Hewitt* from its fact context of opposite-sex domestic partners who could have married, but chose not to do so, to the fact context here of same-sex domestic partners who could not have married. According to Brewer, she and Blumenthal "did not choose not to marry; they were barred from it" by a law, like those declared unconstitutional in *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584 (2015), that has since been repealed and replaced.

¶ 122    The majority overlooked that point, relying on a false version of history in which all Illinoisans could marry as the justification for its application of *Hewitt*. Of course, it is not irrational or discriminatory to deny the protections of the Act's dissolution provisions to persons who never used its marriage provisions. A question remains whether it is irrational and discriminatory to deny the protections of the common law to persons who never could have used the marriage provisions because of their sexual orientation.

¶ 123    The majority assumed that all domestic partners who cohabitate are the same. They are not. Some domestic partners have always enjoyed the right to marry and consequently have always had the option of exercising that right and resorting to the Marriage and Dissolution of Marriage Act in the event of divorce. Others have not always enjoyed that right and have not always been able to resort to the Act. Until Illinois extended the Act to domestic partners who enter civil unions in 2010, all domestic partners who cohabitated without marrying did so knowingly, but not all of them did so willingly. During the entire 26 years that Brewer and Blumenthal were together, marriage was not a legal relationship for them.

¶ 124    In her rehearing petition, Brewer contends that the majority's adherence to *Hewitt* repeated and compounded unconstitutional discrimination against same-sex domestic partners by barring Brewer's restitution claim simply because she did not do what the law prevented her from doing. According to Brewer, "it is irrational to prevent same-sex couples from marrying and, at the same time, exclude them from common law property protections on the ground that, if they wished to have any property protections, they should have married." Brewer asserts that application of *Hewitt* to same-sex domestic partners who separated before they could legally marry creates "an untenable double bind" because it "conditions an important right—the ability to seek an equitable division of property when a relationship ends—on marriage, and then applies that restriction even to couples [who] were legally barred from marriage during the entire duration of their relationship, and even though that legal prohibition has now been ruled unconstitutional by the U.S. Supreme Court."

¶ 125    That double bind and its accompanying constitutional issues are a result of the majority's flawed reasoning. The majority stated that *Hewitt* "did no more than follow the statutory provision abolishing common-law marriage, which embodied the public policy of Illinois that individuals acting privately by themselves, without the involvement of the State, cannot create marriage-like benefits." *Supra* ¶ 61. Again, Brewer does not seek marriage-like benefits. It defies logic, however, to insist that Brewer could not create marriage-like benefits without state involvement when she could not have created a marriage with state involvement. Indeed, the state refused to be involved because Illinois did not allow same-sex marriage while she and Blumenthal were together. The parties' relationship may have been identical in every essential way to that of a married couple (*supra* ¶ 63), but those similarities did not create a legal marriage.

¶ 126    The problems created by the majority opinion could be easily solved by discarding *Hewitt* as an outmoded and unfair rule for all domestic partners. Short of that, rehearing should be allowed to consider not the majority's version of Brewer's constitutional challenge, but her actual argument that *Hewitt*'s rule, as applied to same-sex domestic partners like herself and Blumenthal, whose relationships ended before they were permitted to marry in Illinois, violates due process and equal protection. I dissent from the denial of rehearing.

¶ 127    JUSTICE BURKE joins in this dissent upon denial of rehearing.